UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

THOMAS DOOLEY,

  Plaintiff,

  v.

UNITED INDUSTRIES CORPORATION,
SPECTRUM BRANDS, INC., EUGENE
HOGE, and ALLISON FOLEY,

  Defendants.

Case No. 10-cv-37-JPG

# MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 117) and Memorandum (Doc. 118) in support thereof. Plaintiff Thomas Dooley ("Dooley") filed Responses (Docs. 123, 127) thereto, to which Defendants filed Replies (Docs. 134, 135). Dooley also filed Sur-Replies (Docs. 141, 142), to which Defendants filed a Motion to Strike (Doc. 145). Because the Court's Local Rules absolutely forbid sur-reply briefs, SDIL-LR 7.1(c) ("Under *no* circumstances will sur-reply briefs be accepted.") (emphasis added), the Court **GRANTS** Defendants' Motion to Strike (Doc. 145), **DIRECTS** the Clerk of Court to **STRIKE** Documents 141, 142, and 143 from the docket sheet, and assures the parties that it has not considered those filings in its consideration of the summary judgment motion.

For the following reasons, the Court, *inter alia*, **GRANTS** the instant motion.

## BACKGROUND

**I. Facts**

In analyzing a motion for summary judgment, the reviewing court must construe the

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court, construing the evidence and all reasonable inferences in the light most favorable to Dooley, finds as follows:

Starting sometime in 2005, Defendant Spectrum Brands, Inc. ("Spectrum") and its wholly-owned subsidiary, Defendant United Industries Corporation ("UIC"), hired Dooley to work in their Bridgeton, Missouri, distribution facility. At all times relevant to this litigation, Defendant Allison Foley ("Foley") was Dooley's supervisor, and Rebeckah Long ("Long") was the human resources director at UIC. During his time with UIC, Dooley worked with Douglas Colvin ("Colvin"), another employee of the two companies. Colvin has a rap sheet with three felonies, has been sentenced to eight years imprisonment, and has been a suspect in at least one homicide.

On August 27, 2009, Dooley found Colvin in his previously-locked office and noticed his personal laptop computer was missing. Colvin did not routinely work in the vicinity of Dooley's office. After Dooley accused Colvin of stealing the computer, Colvin repeatedly threatened Dooley, stating "I'm going to fucking kill you motherfucker," or words to that effect. Colvin, who is known as "The Bull," weighs approximately 90 pounds more than Dooley.

The two men made their way to Foley and another supervisor and provided written statements of the occurrence.[1] Dooley was visibly shaken by the confrontation. Meanwhile, Colvin denied the accusations against him, maintaining that the office door was wide open despite an automatic close feature. No employees or other potential witnesses reported seeing or hearing the incident. Upon concluding its investigation, UIC decided not to terminate Colvin because there was not enough evidence proving he engaged in the alleged conduct.[2] Likewise, the Bridgeton Police Department, which conducted interviews on the date of the incident, did not find sufficient evidence to arrest Colvin.

Due to stress and anxiety stemming from the August 27 incident, Dooley received and tendered to Foley and Long a doctor's note excusing him from work until September 10. Long thereafter sent Family and Medical Leave Act ("FMLA") paperwork to Dooley, which he received on September 10. The cover letter to this paperwork, which Dooley did not read, noted that Dooley had fifteen calendar days to complete and return the enclosed forms. The letter also stated as follows: "Please . . . [i]nform Human Resources in writing of any changes in your leave status, your time needed for recovery, or of any intention, if applicable, not to return to work." Doc. 118-2, p. 72. Finally, the cover letter stated that a medical release certifying Dooley's ability to perform his job duties would have to be tendered to human resources before any return to work.

---

[1] UIC maintains policies that employees should report crimes to supervisors/authorities and that no employee should be subject to retaliation for good faith reportage of suspected misconduct.

[2] Because Colvin was a union-represented employee, Long thought his termination, if challenged, required proof of misconduct by clear and convincing evidence.

On September 15, Dooley went to work but forgot to bring the requisite medical release; thus, Foley sent him home to retrieve it. Rather than immediately return to work with the release in hand, Dooley disappeared for several days and failed to inform his employer or superiors of his whereabouts. In fact, Dooley did not call Foley until September 21 to tell her that Colvin was a "murderer,"[3] Doc. 118-2, p. 56, and he did not return to work until September 24.

Meanwhile, Defendants began to monitor and act on Dooley's absenteeism. UIC maintained a policy of terminating employees who missed work without calling in for three consecutive days. Dooley was aware of this policy, and others had been terminated for violating it. Since Dooley did not report his absences on the weekdays of September 16, 17, and 18 and because Dooley had presumably been cleared for work since September 10, Long opted to terminate his employment via certified letter dated September 23, 2009.[4] On

---

[3] When meeting with an acquaintance from the Bridgeton Police Department, Dooley managed to sneak a peek of Colvin's rap sheet on September 21. Again, however, Colvin was only a suspect in at least one homicide.

[4] The termination letter stated, in pertinent part, as follows:

This letter is to officially notify you of your termination from United Industries Corporation, effective September 23 2009.

On September 3rd you provided a doctor's note excusing you from work, and on September 4th you were sent FMLA paperwork which you have failed to complete and return within the 15 allowed days. You did not return to work on September 10th as prescribed in your doctor's note and since you have been eligible to return to work on that day, you have missed a total of 8 working days. During the days of September 16th through September 18th you did not report for work, nor did you notify the Company of your absence. In accordance with United Industries Employee Guidelines, "If an employee is absent 3 days without calling and reporting off (AWOL) the employee will be terminated as a voluntary quit." Therefore, without prejudice and according to Company policy, you [sic] employment is terminated effective today.

September 24, the day *after* Long sent out the termination letter, Dooley returned to UIC and produced a doctor's note excusing any absences from September 16 through September 23. This was the first time Defendants had seen this note.

Despite his best efforts, Dooley has been unable to find employment since his termination.

## II.     Relevant Procedural Posture

On December 18, 2009, Dooley filed suit in Madison County, Illinois, alleging claims of wrongful discharge (Count I), breach of good faith (Count II), negligent hiring (Count III), violation of the FMLA, 29 U.S.C. § 2601, *et seq*., (Count IV), civil conspiracy (Count V), and unsafe place to work (Count VI) against all Defendants. UIC and Spectrum removed the matter to this Court on January 19, 2010, asserting federal question jurisdiction existed pursuant to 28 U.S.C. § 1331 due to the FMLA claim. Dooley eventually filed an Amended Complaint (Doc. 23), which remains the operative complaint in this litigation. This complaint did not add any new claims but did add Foley as a defendant to all existing claims. After the Court partially granted Defendants' Motions to Dismiss (Docs. 33, 44), only the wrongful discharge and FMLA claims remained. Defendants now move for summary judgment on those claims.

---

Doc. 124-11. A plain reading of this letter makes clear that the cited reason for Dooley's discharge was his failure to call off work from September 16 through September 18; after all, the three-day, no-call provision of the United Industries Employee Guidelines is all that is cited. Any reference to the FMLA merely illustrates Dooley's inaction during his last days of employment.

## ANALYSIS

I.   **Motions for Summary Judgment Generally**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must typically present specific facts supported by the record to show that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

II.  **Wrongful Discharge**

   A.   **Preliminary Matters and Missouri's Adherence to the Doctrine of At-Will Employment**

As discussed in its previous Memorandum and Order (Doc. 111), the Court has followed the guidance of the Second Restatement and finds that Missouri has the most significant contacts to this case. As such, its substantive law shall be applied. Additionally, because Dooley does not allege he had a traditional employment contract with specified

terms, the Court continues to hold that he was an at-will employee at all times relevant to this litigation. Doc. 111, p. 9-10. *See Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 663 (Mo. 1988) (en banc); *Adcock v. Newtec, Inc.*, 939 S.W.2d 426, 428 (Mo. App. Ct. 1996) ("An essential element to an employment contract is a statement of duration. 'Without a statement of duration, an employment at will is created . . . .'") (citing *McCoy v. Spelman Mem'l Hosp.*, 845 S.W.2d 727, 730 (Mo. App. Ct. 1993)).

"Generally, an employer can discharge an at-will employee for any reason." *Keveney v. Mo. Military Acad.*, 304 S.W.98, 101 (Mo. 2010) (en banc). This principle is not absolute, as both a protected class exception and public policy exception have been carved from the doctrine of at-will employment. *Id*. The latter exception, which is at issue in the case at bar, "provides that an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy has a cause of action against the employer for wrongful discharge." *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo. App. Ct. 1985).

### B. Whistleblowing as an Exception to At-Will Employment

Under the public policy exception to at-will employment, an employee cannot be terminated for "whistleblowing," i.e. "reporting wrongdoing or violations of law to superiors or third parties." *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. 2010) (en banc). This exception "explicitly recognizes that an employee's superiors can constitute the proper authority to whom to blow the whistle and that an employee who is fired for informing his superiors of wrongdoing by other employees is entitled to bring suit." *Fleshner v. Pepose Vision Inst.*, 304 S.W.3d 81, 97 n.13 (Mo. 2010) (en banc). At trial, the relevant question becomes whether the employee's whistleblowing was a "contributing

factor" in his termination. *Id*. at 95.

That said, the whistleblower exception is "very narrowly drawn," and a wrongful discharge plaintiff "must show that he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of . . . *well established* and *clearly mandated* public policy." *Margiotta*, 315 S.W.3d at 347 (emphasis in original) (citation and quotation marks omitted). Indeed, an action premised on the whistleblower exception "must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." *Id*. The relied-upon statute, regulation, or rule cannot be overly vague, and it must clearly proscribe the underlying conduct. *Id*. at 346-47. In fact, some courts have held that the statute, regulation, or rule must place a positive duty upon the employer. *See Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 876-77 (Mo. Ct. App. 1985). *See, e.g., Link v. K-Mart Corp.*, 689 F. Supp. 982, 985 (W.D. Mo. 1988) (ambiguous reference to "theft" of employer's property was insufficient to state a claim).

It has been held that termination for "internal whistleblowing" — for example, an employee that reports his suspicions of a coworker's theft to a superior — serves as an appropriate basis for a wrongful discharge claim. *Faust v. Ryder Commercial Leasing & Servs.*, 954 S.W.2d 383, 390-91 (Mo. Ct. App. 1997) (employee's claim was not actionable because he merely gave a "courtesy warning" to suspected thieves); *Brenneke v. Dep't of Mo., Veterans of Foreign Wars of U.S.*, 984 S.W.2d 134, 138-39 (Mo. Ct. App. 1998) (affirming $100,000 verdict on employee's claim for wrongful discharge); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879-80 (Ill. 1981). The theft of another's property is

8

obviously a violation of criminal law. Mo. Rev. Stat. § 570.030 (West 2010). But, more importantly, "[t]here is almost universal agreement that sound public policy dictates that the law should encourage the uncovering and prosecution of crime[, and a] policy that discourages citizens from reporting crime or aiding in prosecution would be undesirable and detrimental to society in general." *Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803, 806 (Mo. 1984) (en banc) (citation and quotation marks omitted). *Accord Faust*, 954 S.W.2d at 390-91.

C. **Dooley's Decision to Report Colvin's Theft and Threats Represents the Only Protected Activity at Issue**

Here, bearing in mind *Faust* and *Brenneke* and the broad principle articulated in *Sanders*, the Court agrees with Dooley's proposition that his reporting of Colvin's alleged crime to superiors and the Bridgeton Police Department comported with well established and clearly mandated public policy. Such reportage is not only the policy of Missouri and the nation, but it is touted as one of UIC's many employee policies. Although police did not arrest or charge Colvin and Defendants did not terminate his employment, the Court makes a permissible, reasonable inference that he committed the theft and threats due to a host of circumstantial evidence presented by Dooley.[5] Thus, if Dooley's reportage on or about August 27, 2008, was a contributing factor in his termination, the merits of the wrongful discharge claim belong to a jury.

The Court notes, however, that Dooley's report of Colvin's alleged theft and threats is

---

[5]This evidence includes the hostile reaction of Colvin to Dooley's accusation, Colvin's statement that Dooley's office was wide open when the office had an automatic closer and Dooley reported locking it, and the fact that Colvin did not generally have any business being near Dooley's office.

the *only* matter of well established and clearly mandated public policy at issue. Dooley makes much ado about his informing supervisors of Colvin's rap sheet on and after September 21 and believes that this conduct served as an unlawful basis for his termination. But, Dooley has not pointed to a legal provision nor identified a well established and clearly mandated public policy for reporting the arrests or criminal history of another. If anything, such conduct would likely be *contrary* to the public interest of Missouri due to the unease and animosity it could breed amongst employees. Not only that, but knowledge about another's criminal history may often be illegally obtained or premised on misinformation. Without a statute, regulation, or constitutional regulation readily apparent, the relevance of Colvin's rap sheet is misplaced à la *Margiotta*.

    Meanwhile, Defendants argue that the operative complaint's failure to cite an exact statute, regulation, or constitutional provision is wholly preclusive of his reliance on the whistleblower exception to at-will employment. The Court disagrees. While some non-binding Missouri appellate courts have held that a plaintiff "*must specify* the legal provision violated by the employer [in his complaint]," *Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 940 (Mo. App. Ct. 1998) (emphasis added), the Court finds that the allegations of Dooley's amended complaint sufficiently accomplish same by way of common sense and, again, undeniable public policy. *See* Doc. 23, p. 2, ¶ 7 ("The report of criminal acts that occur on an employer's premises to the employer's supervisory personnel and to [] law enforcement officials is a protected public policy that criminal activity be reported to an employer and to appropriate law enforcement officials."). Moreover, Defendants did not raise this argument in their motions to dismiss; thus, the Court deems the argument waived. Assuming *arguendo*

Defendants were successful in this argument, it would grant Dooley leave to amend his complaint, but it is obviously too late to do so now.

>    D.  Dooley's Report Was Not a Contributing Factor in His Termination

Although the Court finds that Dooley engaged in a protected activity by reporting Colvin's alleged theft and threats, a reasonable jury could not find such conduct was a contributing factor in his termination. Nearly an entire month passed between Dooley's *only* formal report to supervisors about Colvin and when Long decided to terminate Dooley's employment.[6] Even if the Court were suspect of this temporal proximity, which it is not, that alone would generally not be enough to prevent summary judgment. *See Hess v. Sanofi-Synthelabo, Inc.*, 503 F. Supp. 2d 1178, 1188 (E.D. Mo. 2007).

The big issue for Dooley is what he did during that month's time. Again, Dooley simply disappeared after being sent home to retrieve a medical release on September 15. No one at UIC heard from him again until six days later, and no one saw him again until nine days later. Such blatant and unaccounted absenteeism would not be acceptable to any employer, let alone one that actively maintains a three-day, no-call policy in a state that subscribes to at-will employment principles. Dooley was aware of this policy and the possible consequences of any violation. In addition, despite the unambiguous language of the FMLA cover letter, Doc. 118-2, p. 72 ("Please . . . [i]nform Human Resources in writing

---

[6]On September 14, Dooley either e-mailed Foley or left her a voicemail with respect to an incident occurring that day where Colvin pretended to "lunge" at him from 30 feet away. That said, there is no reliable evidence that this informal complaint was ever considered by Long in her decision to end Dooley's employment. More importantly, the making of this complaint does not constitute protected activity because it did not aid in the prosecution of a crime, largely because Colvin's "lunge" from a distance most likely did not even constitute a crime.

of any changes in . . . your time needed for recovery . . . ."), Dooley failed to keep Defendants abreast of his whereabouts when he knew that the last medical release tendered to Foley and Long only lasted up to September 10. Put simply, the Court cannot reasonably infer that Dooley's report of Colvin contributed in any way to his termination and does not see fit to expand Missouri's "very narrowly drawn" whistleblower exception to the doctrine of at-will employment.

Being fully advised of the premises, the Court finds that there is no genuine issue of material fact on Dooley's wrongful discharge claim and shall direct entry of judgment accordingly.

### III. FMLA Interference

Dooley's only other remaining claim is for alleged interference with his rights under FMLA. This claim may be disposed of quickly due to binding precedent from the Seventh Circuit Court of Appeals.

#### A. Relevant Law

In order to succeed on a FMLA interference claim, one must establish the following five elements: "(1) [he] was eligible for FMLA protection; (2) [his] employer was covered by the FMLA; (3) [he] was entitled to FMLA leave; (4) [he] provided sufficient notice of [his] intent to take leave; and (5) [his] employer denied [him] benefits to which [he] was entitled." *Brown v. Auto. Components Holdings, LLC*, 622 F.3d 685, 689 (7th Cir. 2010). Here, the parties do not dispute that the first three elements are met.

With respect to those fourth and fifth elements, the FMLA does not permit individuals on leave "to keep their employers in the dark about when they will return.

*Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000). Rather, FMLA regulations make clear that "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302 (West 2011). This includes the notice provisions contained in a collective-bargaining agreement. *See, e.g., Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002); *Gilliam*, 233 F.3d at 971. The primary public policy is perhaps obvious: "[n]otice enables an employer to keep its business operating smoothly by brining in substitutes or hiring temporary help." *Gilliam*, 233 F.3d at 971.

### B. Defendants Could Not Interfere with Dooley's FMLA Rights Because of His Failure to Call in His Absences

In the case at bar, even though Dooley received FMLA paperwork and arguably intended to take FMLA leave, Defendants terminated him for failing to comply with the three-day, no-call corporate policy as discussed *supra*. Per the strong factual parallels of *Gilliam* and its progeny, this action was clearly proper and not in contravention of Dooley's FMLA rights.

Dooley believes that he had 15 days from receipt of the FMLA paperwork to apprise Defendants of his whereabouts. This position makes little sense from a practical standpoint — namely, under this theory, an employee could simply disappear for 15 after notifying his employer of his intent to take FMLA leave. While Dooley did have 15 days to submit FMLA paperwork in order to properly take FMLA leave, he *still* had to comply UIC's usual and customary notice requirement. This is something he undeniably failed to do. Dooley has not made a showing of unusual circumstances, and the Court does not find unusual

circumstances to be present in this case.

Being fully advised of the premises, the Court finds that there is no genuine issue of material fact on Dooley's FMLA interference claim and shall direct entry of judgment accordingly.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 117). The Court **DENIES as moot** all pending motions and **DIRECTS** the Clerk of Court to enter judgment *instanter*.

**IT IS SO ORDERED.**
**DATED: August 24, 2011**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
